<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

UNITED STATES OF AMERICA        )
                                )  Criminal Action
                                )  No. 09-cr-211
            vs.                 )
                                )
CHARLES EVERITT KING,           )
                                )
            Defendant           )


*   *   *

APPEARANCES:

            MARK S. MILLER, ESQUIRE
            Assistant United States Attorney
                On behalf of the United States of America

            WILLIAM R. McELROY, ESQUIRE
                On behalf of Defendant Charles Everitt King


*   *   *


<u>O P I N I O N</u>

JAMES KNOLL GARDNER,
United States District Judge

        This matter is before the court on Defendant Charles

Everitt King's Motion for Judgment of Acquittal Pursuant to

Rule 29 of the Federal Rules of Criminal Procedure and Defendant

Charles Everitt King's Motion for New Trial Pursuant to Rule 33

of the Federal Rules of Criminal Procedure, which motions were

both filed on September 15, 2009.[1]  For the following reasons, I

---

[1]     The Government's Response to Defendant's Post-Trial Motions was
filed on December 9, 2009.  Defendant Charles Everitt King's Brief in Support
of Motion for New Trial and Judgment of Acquittal was filed December 19, 2009.

deny both defendant's motion for judgment of acquittal and defendant's motion for a new trial.

On March 31, 2009 defendant Charles Everitt King was charged in a two-count Indictment. Specifically, defendant was charged with armed bank robbery in violation of 18 U.S.C. § 2113(d) (Count One) and using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two).

The charges arise from a bank robbery which occurred on July 26, 2009 at the Manufacturer's and Traders Trust Company ("M&T Bank") located at 2421 Old Philadelphia Pike, Smoketown, Lancaster County, Pennsylvania.

A jury trial was held before me on September 1-4 and 8, 2009. On September 8, 2009 the jury returned a verdict of guilty on both counts of the Indictment. On September 15, 2009 defendant filed his motions seeking judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure and a new trial pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure.

## CONTENTIONS OF THE PARTIES

### Defendant's Contentions

Defendant contends that, based upon the evidence presented by the government, no rational trier of fact could have

found him guilty beyond a reasonable doubt of the crimes charged in the Indictment. In support of each of his motions, defendant asserts eight reasons why the evidence was either insufficient to sustain his conviction by the jury or the verdict is against the weight of the evidence.

Specifically, defendant argues that:

(1) there was no proof that defendant owned a gun or that a gun was found in his possession;

(2) none of the clothing used by the bank robber was found in defendant's possession;

(3) the testimony of Dee Baker established an uncontroverted alibi for defendant;

(4) no eyewitness identified defendant as the bank robber or as being in the bank;

(5) the majority of the money taken from the bank was never found in defendant's possession;

(6) there was insufficient evidence to prove that a dye pack was present in defendant's car;

(7) defendant's work history, sales and accounts receivable refuted the government's contention that defendant's motive for the bank robbery was that he was destitute; and

(8) there was no forensic evidence which proved that defendant was in the bank.

Finally, defendant avers that in analyzing all of the evidence presented at trial, no rational trier of fact could have found beyond a reasonable doubt the essential element of defendant's presence at the time of the robbery.

<u>Government's Contentions</u>

The government contends that the weight of evidence presented against defendant King is overwhelming and sufficient to support the jury's verdict.  The government acknowledges that there were no eyewitnesses who placed defendant inside the bank and that no clothing or gun was ever recovered and linked to defendant.  However, the government asserts that there is substantial circumstantial evidence linking defendant to this crime.

Specifically, the government contends that, among other evidence, the following circumstantial evidence supports defendant's conviction.

> (1)  defendant admitted that he was trained and had worked as a barber, thereby making it plausible that defendant was familiar with methods of altering his appearance;
>
> (2)  defendant's brother and sister-in-law testified about defendant's radical change in appearance shortly after the robbery, behavior consistent with consciousness of guilt on defendant's part, and evidence of his efforts to avoid apprehension;
>
> (3)  testimony of the laboratory expert from the Federal Bureau of Investigation that stains found inside defendant's car contained chemical components consistent with the dye packs given by the bank teller to the robber together with the money;
>
> (4)  based upon defendant's assertions that he had lost his contracting business, had income of only $215.00 per month, was unable to pay his bills, and had filed for disability benefits, his

testimony established that he was running out of money;

(5) defendant was evicted from his prior residence and had been living in a camper parked either on a residential street near properties his brother owned or in a number of different campgrounds;

(6) defendant could not identify anyone for whom he had worked in the three months preceding his arrest, or from whom he had received a payment of any money;

(7) the alibi testimony of Dee Baker was not credible because her testimony was inconsistent with previous statements she gave to law enforcement officers;

(8) because of the numerous inconsistent statements defendant made about his life and activities, his testimony was not credible; and

(9) the multiple money orders defendant purchased and the corresponding deposits into his personal bank accounts of those money orders was consistent with defendant obtaining a large sum of money in the robbery.

In addition, concerning defendant's Rule 29 motion for judgment of acquittal, the government contends that the evidence taken in the light most favorable to the government is sufficient to support the jury verdict. Finally, concerning defendant's Rule 33 motion for new trial, the government asserts that a reweighing of the evidence presented will support the jury verdict as well.

On July 26, 2008 a lone gunman entered the M&T Bank branch located at 2421 Old Philadelphia Pike, Lancaster, Pennsylvania and robbed the bank of approximately $20,219.00. Below, I summarize the trial testimony of the key witnesses involved in this case and other stipulated evidence necessary for my determinations regarding defendant's two post-trial motions.

## Julie K. Burkholder

Julie K. Burkholder testified at trial on September 1, 2009 as follows.  Ms. Burkholder is a teller at the M&T Bank branch located at 2421 Old Philadelphia Pike, Lancaster, Pennsylvania.  This M&T Bank location is referred to as the "Smoketown" branch.[3]

At approximately 11:30 a.m., a white male came into the bank wearing sunglasses, a baseball cap, jeans and a gray

---

[2]      In its consolidated response to defendant's two post-trial motions, the government provided a summary of the testimony presented at trial.  (See Government's Response to Defendant's Post-Trial Motions filed December 9, 2009, at pages 2-17).  In his reply to the government's response defendant stated:  "The defense does not dispute the summary of the trial testimony as presented by the government."  (Defendant Charles Everitt King's Brief in Support of Motion for a New Trial and Judgment of Acquittal filed December 19, 2009, at page 1).

Accordingly, I have included the summary of the testimony of pertinent witnesses contained in the government's response together with other evidence necessary to my determinations regarding defendant's two post-trial motions.

[3]      Notes of Testimony of the jury trial conducted on September 1, 2009 before me in Allentown, Pennsylvania, styled "Transcript of Trial before the Honorable James Knoll Gardner[,] United States District Judge" ("N.T. 9/1/09"), at page 27.

sweatshirt inscribed "Sports and XXL".[4]  Ms. Burkholder further
described the robber as being in his late 30s to 40s and 5'9" to
5'10" in height.  His hair was cut short, dyed red, and the dye
job on his hair was a bad one.[5]  On cross-examination,
Ms. Burkholder acknowledged that on the date of the robbery she
probably told the police that the robber appeared to be between
30 and 35 years of age.[6]

Upon entering the bank, the white male walked the
shortest distance to Ms. Burkholder's window.  She greeted the
man.  He pulled a black, semi-automatic handgun from his
waistband and pointed the gun at first at her, then toward the
ceiling.[7]  When the man pulled the gun, he stated to
Ms. Burkholder "I guess you know what this is", referring to the
gun.  She responded that she did.[8]  The man then threw a canvas
bag across the counter at her and told her to fill it up.[9]
Ms. Burkholder began to fill up the bag with money located in her
teller drawer.[10]

---

[4]     N.T. 9/1/09 at page 28.

[5]     N.T. 9/1/09 at page 35.

[6]     N.T. 9/1/09 at page 48.

[7]     N.T. 9/1/09 at page 29.

[8]     N.T. 9/1/09 at page 30.

[9]     Id.

[10]    Id.

At the time of the robbery, Ms. Burkholder was working with two other women, Roni Hackman-Ryner, the teller supervisor, and Sarah Wenger, the customer service representative.[11] There were no other customers in the bank.[12]

While Ms. Burkholder was filling the bag, Ms. Hackman-Ryner came out of the Bank's vault.[13] The robber saw Ms. Hackman-Ryner and said to her "you have keys; I want to go in there", referring to the vault.[14] Ms. Hackman-Ryner indicated to the robber that there was not enough time and that she would just give him the money from her drawer.[15]

When Ms. Burkholder was finished putting the money from her drawer in the bag, she walked down to Ms. Hackman-Ryner's teller window and held the bag as Ms. Hackman-Ryner placed the money from her drawer in the bag.[16] While Ms. Hackman-Ryner was placing money in the bag, the robber stated that he did not want any one-dollar bills. He also said, "I'm not afraid to shoot somebody and do what you are told or nobody's going home today."[17]

---

[11] Id.

[12] N.T. 9/1/09 at page 33.

[13] N.T. 9/1/09 at page 31.

[14] Id.

[15] Id.

[16] N.T. 9/1/09 at pages 31-32.

[17] N.T. 9/1/09 at page 32.

While Ms. Hackman-Ryner was placing money in the bag, Ms. Burkholder saw her place her "bait money" and a dye pack in the bag.[18]  Bait money is a package of money where all the serial numbers are pre-recorded.[19]  A dye pack has a few bills with the serial numbers pre-recorded and a dye pack in the center of the bills.  The dye pack is supposed to expel dye once it leaves the bank branch.[20]  Every teller has a dye pack in his or her drawer. Each teller has been instructed to place one dye pack in a bag in the event of a robbery, if the teller feels comfortable doing so.[21]

After Ms. Hackman-Ryner had placed the money, the marked bills, and the dye pack in the robber's bag, she gave the bag to Ms. Burkholder.  Ms. Hackman-Ryner pushed Ms. Burkholder away and told her, "go, just go", at which time Ms. Burkholder gave the bag to the robber.[22]  The robber then directed all three women to come into the lobby and kneel down.[23]  Ms. Wenger entered the lobby first, followed by Ms. Burkholder.[24]

---

[18]  Id.

[19]  Id.

[20]  Id.

[21]  N.T. 9/1/09 at pages 32-33.

[22]  N.T. 9/1/09 at page 33.

[23]  Id.

[24]  Id.

Ms. Hackman-Ryner did not get to the lobby before the robber was through the first set of doors on his way out of the bank.[25]

After the robber left the bank, Ms. Burkholder jumped up and saw the robber run outside, past the side window. She observed the robber run across the parking lot toward a farm area across the street from the bank.[26] As the robber was fleeing, Ms. Burkholder saw a red puff of smoke coming from the bag, indicating that the dye pack had gone off.[27]

During her testimony, Ms. Burkholder identified five still photographs from the security video taken at the bank.[28] The photographs depicted the robber at various stages of the robbery. These pictures were displayed to the jury.[29]

After the robbery, Ms. Burkholder prepared documents including a Cash Verification Strike Sheet, which verifies the amount of cash in a particular teller drawer, for July 26, 2008 before the robbery.[30] In addition, Ms. Burkholder prepared a Bait Currency Record, which is a list of all the serial numbers

---

[25]   Id.

[26]   N.T. 9/1/09 at page 34.

[27]   N.T. 9/1/09 at page 35.

[28]   Government Exhibits 1-5.

[29]   N.T. 9/1/09 at pages 36-39.

[30]   N.T. 9/1/09 at page 43; Government Exhibits 10-13.

for the bait money that was given to the robber from her teller window.[31]

## Roni Hackman-Ryner

Roni Hackman-Ryner, the teller supervisor at the M&T Bank Smoketown branch, testified at trial on September 1, 2009 as follows.  Ms. Hackman-Ryner was present in the bank on July 26, 2008.[32]  The robber was Caucasian, with a tan that appeared to be fake.[33]  The robber appeared to be "middle aged" and approximately 5'7" tall.[34]  However, on cross-examination, Ms. Hackman-Ryner acknowledged that on the day of the robbery she may have told the police that the robber looked to be in his 30s.

Ms. Hackman-Ryner recalled that the robber had "burnt orange dye" in his hair, had a very dark-colored goatee, and that his hair was not long, only down to his ears.[35]  The robber was wearing a dark black or blue ball cap, black sunglasses and a gray sweatshirt.[36]

Ms. Hackman-Ryner also completed a Cash Verification Strike Sheet and a Bait Currency Record similar to those prepared

---

[31]    N.T. 9/1/09 at pages 40-42; Government Exhibits 6 and 7.

[32]    N.T. 9/1/09 at page 52.

[33]    N.T. 9/1/09 at pages 57-58.

[34]    N.T. 9/1/09 at page 58.

[35]    Id.

[36]    N.T. 9/1/09 at page 59.

by Ms. Burkholder together with a Teller Cash Balancing Sheet and Teller Strike Sheet.[37]

Finally, in addition to testifying to the events during the robbery, which testimony is similar to the testimony of Ms. Burkholder describing those events[38], Ms. Hackman-Ryder had a specific recollection of the threat made by the robber. The robber stated, "someone give me some f...ing money or no one's going home today." The robber further said, "I'm not afraid to shoot all of you."[39]

### Sarah Wenger

On September 1, 2008 Sarah Wenger, the Customer Service Representative at the Smoketown branch, testified at trial as follows. Ms. Wenger was present at the bank on July 26, 2008 when the bank was robbed.[40] The robber was a white male, "a taller man", approximately 5'10" to 5'11" with a thin build and he looked to be in his 50s.[41] The robber wore a "darker color" hat and a gray sweatshirt with an "XXL" logo on it.[42] He had

---

[37]     N.T. 9/1/09 at pages 59-66; Government Exhibits 8,9, 14-16.

[38]     N.T. 9/1/09 at pages 54-57.

[39]     N.T. 9/1/09 at pages 53-54.

[40]     N.T. 9/1/09 at page 73.

[41]     N.T. 9/1/09 at pages 76-79.

[42]     N.T. 9/1/09 at pages 76-77.

black hair that was straight and short, and he was wearing sunglasses.[43]  Finally, the robber had a tan.[44]

## Jill Caruso

On September 1, 2009 Jill Caruso, Regional Security Manager for M&T Bank testified at trial as follows.  Ms. Caruso stated that part of her job duties for the bank is the investigation of robberies that occur at the bank branches.[45]  As part of the investigation of the robbery at the Smoketown branch, Ms. Caruso determined that the total loss to the bank as a result of the robbery was $20,219.00.[46]

On the date of the robbery, the tellers at the Smoketown branch had bait money which was to be handed out in the event of a robbery, and which was given to the robber on July 26, 2008.[47]  M&T Bank, and specifically the Smoketown branch, had been supplied with dye packs by 3SI Security Systems.[48]

On August 26, 2008, pursuant to a search warrant, Ms. Caruso supplied bank records to Detective Preston Gentzler of the East Lampeter Township Police Department regarding defendant

---

[43]   N.T. 9/1/09 at pages 77-78.

[44]   N.T. 9/1/09 at pages 79-80.

[45]   N.T. 9/1/09 at page 81.

[46]   N.T. 9/1/09 at page 85.

[47]   N.T. 9/1/09 at pages 83-84.

[48]   N.T. 9/1/09 at pages 82-84, 90-91.

Charles Everitt King.[49]  The records of defendant King's bank account indicate that on May 9, 2008 Mr. King had a balance of $784.29 in his account at M&T Bank.[50]

Furthermore, the last five entries on defendant's bank statement for the month of May 2008 reflected that defendant had insufficient funds fees assessed because he had overdrawn his account, and his ending balance at the end of May 2008 was a negative $289.00.[51]  Extended overdraft fees were repeatedly recorded on defendant's account throughout the month of June 2008, with a closing balance at the end of June of negative $848.22.[52]

Ms. Caruso further identified various money orders made payable to Mr. King, all of which were endorsed by Mr. King, and deposited into Mr. King's account in late July and early August 2008.[53]  In addition, Ms. Caruso identified five deposits totaling $10,500.00 made into Mr. King's account between August 4 and 7, 2008.[54]  Finally, the balance in Mr. King's account at the end of August 2008 was $9457.97.[55]

---

[49]  N.T. 9/1/09 at pages 86-90.

[50]  N.T. 9/1/09 at page 94.

[51]  N.T. 9/1/09 at page 95.

[52]  N.T. 9/1/09 at page 96.

[53]  N.T. 9/1/09 at pages 97-107, 111-113, 116-117.

[54]  N.T. 9/1/09 at page 108.

[55]  N.T. 9/1/09 at page 109.

<u>Detective Scott Eelman</u>

‎            On September 1, 2009 East Lampeter Township Police Department Detective Scott Eelman testified at trial as follows. On July 26, 2008 Detective Eelman became aware of the robbery of the Smoketown branch of M&T Bank.[56]

‎            On August 22, 2008, Detective Eelman together with Detective Joseph Edgell became involved in the investigation by interviewing defendant Charles Everitt King at the East Lampeter Township Police Department.[57]  Prior to the start of the interview, Detective Eelman advised Mr. King of his <u>Miranda</u>[58] warnings both orally and in writing, and Mr. King signed a document indicating that he had been given the warnings and was waiving his rights.[59]

‎            During the interview, Mr. King provided the following information to Detectives Eelman and Edgell:

‎            (1)  he received the money used for the purchase of money orders from painting barns in Virginia for three weeks;[60]

---

[56]     N.T. 9/1/09 at page 122.

[57]     <u>Id.</u>

[58]     <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).

[59]     N.T. 9/1/09 at pages 123-124; Government Exhibit 22.

[60]     N.T. 9/1/09 at page 126.

(2)  when asked if he recently purchased any money orders, Mr. King responded he purchased quite a few, from different places;[61]

(3)  when shown a surveillance photo from the Wal-Mart in Elverson, Pennsylvania of a truck believed to belong to him, Mr. King stated, "that is my truck";[62]

(4)  when shown a surveillance photo from the Elverson Wal-Mart of a white male and asked if he thought it looked like him, Mr. King stated "Yeah it looks like me";[63]

(5)  when asked if he may have purchased money orders at the Elverson Wal-mart, Mr. King responded, "I may have, I'm not sure";[64]

(6)  he had never seen, spent, nor possessed any dye-stained money that he knew of;[65] and

(7)  he had only bought a total of three $500.00 money orders.[66]

On August 26, 2008, Detective Eelman executed a search warrant on the Nissan Sentra motor vehicle belonging to Mr. King.[67]  During the search of defendant's vehicle, red staining was observed on the carpeting on the front passenger side, front floor, near the transmission hump.[68]  In addition,

---

[61]    N.T. 9/1/09 at pages 128-129.

[62]    N.T. 9/1/09 at page 129.

[63]    N.T. 9/1/09 at pages 129-130.

[64]    N.T. 9/1/09 at page 130.

[65]    N.T. 9/1/09 at pages 130-131.

[66]    N.T. 9/1/09 at page 131.

[67]    Id.

[68]    N.T. 9/1/09 at pages 136-137.

another red stain was located under the front passenger seat.[69]
The carpeting was photographed and then cut out of the vehicle
and secured for forensic testing.[70]

### Michael P. Rickenbach

On September 2, 2009 Michael P. Rickenbach, Forensic
Chemist Examiner for the Federal Bureau of Investigation
testified at trial as follows.  Mr. Rickenbach tested the carpet
samples from defendant's car that were sent to him by Special
Agent Sean Dowd of the FBI.[71]  Mr. Rickenbach opined, that based
upon his testing of the carpet samples, that the two carpet
samples obtained from Mr. King's vehicle contained the chemicals
used in the red dye and tear gas used in the bank's dye packs
placed in the robber's bag.[72]

### Franklin Aquila

Franklin Aquila, Senior Field Service representative of
3SI Security Systems ("3SI") testified at trial on September 3,

---

[69]     N.T. 9/1/09 at page 138.

[70]     Id.

[71]     Notes of Testimony of the jury trial conducted on September 2,
2009 before me in Allentown, Pennsylvania, styled "Transcript of Trial before
the Honorable James Knoll Gardner[,] United States District Judge"
(N.T. 9/2/09)(Part I), at page 6.

    The transcript of the testimony taken on September 2, 2009 was
transcribed in two separate parts, on two separate dates.  The testimony of
Mr. Rickenback was transcribed on September 4, 2009.  I refer to this portion
of the transcript as ("N.T. 9/2/09")("Part I").  The testimony of all other
witnesses and proceedings on September 2, 2009 is in a separate volume, which
I will refer to below in this Opinion as ("N.T. 9/2/09")("Part II").

[72]     N.T. 9/2/09 (Part I), at page 14.

2009 as follows. His organization provides security for banks and other organizations for prevention of robberies.[73] Mr. Aquila's duties include traveling to see clients, training staff, installing systems and doing maintenance and upgrades throughout the two-year contract cycle.[74]

Among the products sold by 3SI are dye packs used in banks.[75] The Smoketown branch of M&T Bank was using his company's dye packs on July 26, 2008, the date of the robbery.[76] Mr. Aquila authenticated the Material Safety Data Sheet for the dye packs used at the Smoketown branch. The data sheet for the dye packs used that day included the chemical components of the dye packs.[77]

<u>Lisa Goodhart</u>

On September 2, 2009 Lisa Goodhart, a Customer Service Representative for the Wal-Mart store in Elverson, Pennsylvania, testified at trial as follows. Ms. Goodhart was working at the

---

[73]    Notes of Testimony of the jury trial conducted on September 3, 2009 before me in Allentown, Pennsylvania, styled "Transcript of Trial before the Honorable James Knoll Gardner[,] United States District Judge" ("N.T. 9/3/09"), at page 7.

[74]    N.T. 9/3/09 at page 7.

[75]    <u>Id.</u>

[76]    N.T. 9/3/09 at page 8.

[77]    N.T. 9/3/09 at pages 17-18; Government Exhibit 32.

Wal-Mart store on July 28, 2008[78] when she sold $1,000.00 worth of money orders to a man who paid for them in cash with bills that had pink marks on them.[79]  The man laid a clear plastic bag on the counter with numerous bills inside with pink marks on them.[80]  The man told her that he had spilled something on the bills and had washed and dried them.[81]

Numerous times during the transaction, Ms. Goodhart tried to alert her supervisors about the transaction because the man seemed very nervous and was constantly looking down, away from the overhead camera.[82]

Ms. Goodhart's supervisors did not come to her counter until the transaction was completed and the man had left.[83]  When her supervisors did come to her register, the cash used to purchase the money orders was segregated from the rest of the money in her register.[84]

---

[78]     The testimony of Ms. Goodhart was that she sold the money orders in question on July 28, 2009.  However, all the other evidence including the videotape of the incident, the testimony of Chief Stolz and the actual money orders themselves reflect that the transaction occurred on July 29, 2008.

[79]     Notes of Testimony of the jury trial conducted on September 2, 2009 before me in Allentown, Pennsylvania, styled "Transcript of Trial before the Honorable James Knoll Gardner[,] United States District Judge" ("N.T. 9/2/09")(Part II), at pages 5-7.

[80]     N.T. 9/2/09 (Part II), at page 8.

[81]     Id.

[82]     N.T. 9/2/09 (Part II), at pages 8-9.

[83]     N.T. 9/2/09 (Part II), at page 21.

[84]     N.T. 9/2/09 (Part II), at page 22.

Ms. Goodhart identified several $5.00 and $20.00 bills with pink stains, that were contained in a pouch submitted into evidence.[85] Ms. Goodhart further authenticated the videotape of the money order transaction, which was later turned over to Chief Paul Stolz of the Caernarvon Township Police Department.[86]

Chief Paul Stolz

On September 2, 2009 Chief of Police Paul Stolz of the Caernarvon Township Police Department, Morgantown, Berks County, Pennsylvania testified at trial as follows. On July 29, 2009 he responded to the Elverson Wal-Mart store and took possession of money used to purchase two $500.00 money orders earlier that day.[87] In addition, Chief Stolz requested and received from Wal-Mart a DVD, from the store's security camera, showing footage of the parking lot, entrance ways, customer service area and the approach areas of the store around the time of the money order transaction.[88]

On July 30, 2008 Chief Stolz obtained from Detective Michelle Velez a list of the serial numbers of the bait money taken during the Smoketown bank robbery.[89] Upon comparing the

---

[85]   N.T. 9/2/09 (Part II), at pages 14.

[86]   N.T. 9/2/09 (Part II), at pages 14-20.

[87]   N.T. 9/2/09 (Part II), at page 26.

[88]   N.T. 9/2/09 (Part II), at pages 26 and 29.

[89]   N.T. 9/2/09 (Part II), at pages 27-28 .

bills recovered from the Wal-Mart and the list of bait money,
Chief Stolz determined that five of the $5.00 bills were part of
the bait money stolen from the Smoketown branch.[90]  On August 11,
2008, Chief Stolz turned over the money and DVD from the Elverson
Wal-Mart over to Detective Preston Gentzler of the East Lampeter
Police Department.[91]

Terry Hohn

On September 2, 2009, Terry Hohn, Head Teller at the
Fulton Bank branch in Mountville, Lancaster County, Pennsylvania,
testified at trial.  Ms. Hohn testified that on July 28, 2008 she
was working and discovered money in a Turkey Hill night deposit
box from the Centerville Road location.  That money had red
stains on it.[92]  There was a stack of $20.00 and $5.00 bills
which all had red around the edge; and the bills were in piles in
the deposit bag, suggesting that they had all been deposited by
the same customer.  She turned over this currency ($1,225.00) to
Detective Gentzler.[93]

Kasey Patterson

Kasey Patterson, Second Assistant at the Turkey Hill
Minit Market on Centerville Road, Lancaster, Pennsylvania,

---

[90]   N.T. 9/2/09 (Part II), at page 28.

[91]   N.T. 9/2/09 (Part II), at page 29.

[92]   N.T. 9/2/09 (Part II), at pages 32-34, 37.

[93]   N.T. 9/2/09 (Part II), at page 34.

testified at trial opn September 2, 2009 as follows.  On July 29, 2008 Ms. Patterson was training another cashier named Whitney Coolidge, when a "scruffy looking", "middle-aged white male" entered the store.[94]  Ms. Patterson further described the man as average height, around 5'6" to 5'7"; average weight, around 160; greyish, light colored hair; and dressed in a regular shirt, jeans and a baseball cap.[95]

The man sought to purchase a $1000.00 money order, but was told by Ms. Patterson that money orders were sold in up to $500.00 increments.[96]  The man indicated that he still wanted to purchase $1000.00 worth of money orders and paid for them in cash from money that he had in a plastic Ziploc bag.[97]

The money looked unusual because it had red dye on it.[98]  The man explained that his wife had dropped the money in beet juice, while canning.[99]

Ms. Patterson completed the transaction and sold the man two $500.00 money orders.[100]  When shown the money deposited at Fulton Bank, Ms. Patterson testified that the Fulton Bank

---

[94]    N.T. 9/2/09 (Part II), at page 43.

[95]    N.T. 9/2/09 (Part II), at page 43.

[96]    N.T. 9/2/09 (Part II), at page 44.

[97]    Id.

[98]    Id.

[99]    N.T. 9/2/09 (Part II), at page 45.

[100]   Id.

money looked like the money used to purchase the money orders from her at Turkey Hill.[101]

After completing the transaction, Ms. Patterson dropped the money used to purchase the money orders into the store's safe.[102]  The transaction was videotaped by the store security system.  Ms. Patterson authenticated the videotape as depicting what occurred during the money order transaction.[103]

Finally, sometime after the money order purchase, Detective Gentzler contacted Ms. Patterson, and she told him what happened.[104]

<u>Monica Wiker</u>

Monica Wiker, a realtor and rental agent with Hostetter Realty in Gap, Pennsylvania, testified on September 2, 2009 as follows.  Ms. Wiker rented a property at 308 Wissler Road, New Holland, Pennsylvania to defendant and his wife, Bobbi King.[105] The Kings were anxious to rent as soon as possible because "they were staying in a campground, and it was getting colder".[106]  The

---

[101]   N.T. 9/2/09 (Part II), at page 47; Government Exhibit 33.

[102]   N.T. 9/2/09 (Part II), at page 45.

[103]   N.T. 9/2/09 (Part II), at pages 53-56; Government Exhibit 34.

[104]   N.T. 9/2/09 (Part II), at page 45.

[105]   N.T. 9/2/09 (Part II), at pages 62-63.

[106]   N.T. 9/2/09 (Part II), at page 63.

Kings told Ms. Wiker that they had been staying at campgrounds in Virginia before relocating in Pennsylvania.[107]

As part of the application process, the Kings provided her with a letter from M&T Bank which indicated that the Kings had a checking account balance of $9,541.52.[108] The Kings also supplied a letter of reference from a Ralph Bierman, who stated that he had rented to the Kings from 2002 until 2008 and that they had always paid their rent on time.[109]

The rental application was completed on August 6, 2008,[110] and was signed by the Kings on August 13, 2008.[111] The application indicated that Mrs. King did not currently have a job, but was looking for one. No employment information was provided for Mr. King.[112]

Finally, Mr. King paid Ms. Wiker $2,400.00 in cash for an $800.00 security deposit, and for the first and last month's rent of $800.00 per month.[113] A balance of $437.40 was required by mid-September 2008 for part of the August 2008 rent.[114]

---

[107]    N.T. 9/2/09 (Part II), at pages 65-66.

[108]    N.T. 9/2/09 (Part II), at page 69.

[109]    N.T. 9/2/09 (Part II), at pages 64-65, 77-79.

[110]    N.T. 9/2/09 (Part II), at page 63.

[111]    N.T. 9/2/09 (Part II), at pages 81-82.

[112]    N.T. 9/2/09 (Part II), at page 66; Government Exhibit 35.

[113]    N.T. 9/2/09 (Part II), at page 69.

[114]    Id.

<u>Steven Paul Jones</u>

On September 2, 2009, Steven Paul Jones, a friend of defendant testified as follows.  He knew Mr. King for about five years, and they had previously done painting jobs together.[115]  Mr. King bought a pick-up truck from Mr. Jones for $600.00.  When Mr. Jones asked defendant where he got the money to buy the truck, Mr. King replied that his brother had loaned him some money.[116]

The Kings were evicted from their prior residence on College Avenue in Lancaster, Pennsylvania.[117]  Mr. King contacted Mr. Jones and asked him to come see his new residence, which turned out to be a nice farmhouse.[118]  When Mr. Jones asked Mr. King where he obtained the money for the farmhouse, defendant responded that he received the money as part of an inheritance from his aunt.[119]

Mr. King had previously cut Mr. Jones' hair, as well as defendant's own hair.[120]  When Mr. Jones visited Mr. King at the

---

[115]    N.T. 9/2/09 (Part II), at pages 85-86.

[116]    N.T. 9/2/09 (Part II), at pages 88-89.

[117]    N.T. 9/2/09 (Part II), at pages 101-102.

[118]    N.T. 9/2/09 (Part II), at pages 90-91.

[119]    N.T. 9/2/09 (Part II), at page 92.

[120]    N.T. 9/2/09 (Part II), at pages 91-92.

new farmhouse, Mr. King was more clean-shaven than Mr. Jones had ever seen him.[121]

Finally, in August 2008 Mr. Jones drove Bobbi King to the East Lampeter Township Police Department and later noticed that she left a small pocketbook inside his truck.[122] He looked inside the pocketbook and saw a checkbook indicating that the account had $7,000.00 in it.[123] In addition. Mr. Jones noticed some United States currency in the pocketbook which had "red ink" on it.[124]

## Ralph Bierman

On September 3, 2009, Ralph Bierman, a friend of defendant King's testified at trial. Mr. Bierman testified that although he prepared a letter for the realtor Monica Wiker stating that he rented a property to Charles and Bobbi King from 2002 to 2008, he in fact had never rented any property to the Kings at any time.[125]

## William King

William King, the brother of defendant Charles Everitt King, testified on September 3, 2009 as follows. For several

---

[121]    N.T. 9/2/09 (Part II), at page 93.

[122]    N.T. 9/2/09 (Part II), at page 95.

[123]    Id.

[124]    N.T. 9/2/09 (Part II), at page 95-96.

[125]    N.T. 09/3/09 at pages 24-25.

weeks beginning in the second week of July 2008, his brother Charles and Charles' wife Bobbi lived in a camper parked on the street outside 217 Brimmer Avenue, New Holland, Pennsylvania.[126] His brother and sister-in-law had also been living at campgrounds and a state park during the end of June and first week of July 2008.[127]

His brother has held a Pennsylvania barber's license for approximately eight years.[128]  In the past, defendant cut hair in William King's garage and in a small room attached to an apartment in which defendant had lived.[129]

In late July 2008, Charles King came to William's house with his head and face clean shaven, and William had never seen his brother look like that before.[130]  Charles told William that Charles was trying to cut his own hair, and because Charles has problems with his right hand, he went too far, right down to the scalp.  Therefore, Charles decided to shave off all of his hair.[131]

---

[126]    N.T. 9/3/09 at pages 38-40.

[127]    N.T. 9/3/09 at page 40.

[128]    N.T. 9/3/09 at pages 44-45.

[129]    N.T. 9/3/09 at page 45.

[130]    N.T. 9/3/09 at pages 45-46.

[131]    N.T. 9/3/09 at page 46.

In early July Charles borrowed $45.00 from him and paid him back prior to July 23, 2008, which was William's birthday.[132] When Charles came to repay the debt, defendant looked the way he normally did.[133] However, a few days after William's birthday (sometime between July 26 and 29, 2008), Charles came over again and brought William two dozen crabs as a birthday present.[134] At the time Charles brought the crabs, Charles' head and face were clean shaven.[135]

Contrary to what defendant told investigators, William never had loaned his brother $3,000.00 and had not loaned Charles any money to buy his truck.[136] On the contrary, in early August 2008 defendant asked William to look into the value of defendant's truck because Charles wanted to sell it.[137]

Although he and his brother had an Aunt who had passed away about two years earlier, they did not have an Aunt who recently died and left an inheritance to family members.[138]

---

[132]   N.T. 9/3/09 at page 48.

[133]   Id.

[134]   N.T. 9/3/09 at pages 48-49.

[135]   N.T. 9/3/09 at page 45.

[136]   N.T. 9/3/09 at pages 46-47.

[137]   N.T. 9/3/09 at page 42.

[138]   N.T. 9/3/09 at page 50.

Defendant never told William anything about finding any money in a cornfield.[139]

Defendant also told his brother that he suffered nerve damage in his hand which prevented him from holding paintbrushes. Defendant told his brother that he was going to file for disability payments because of this condition.[140]

William found small plastic Ziploc bags ("baggies") with dollar amounts written on them.  He found these baggies in the trash that his brother Charles asked William to dispose of because Charles did not have garbage service at his house.[141] Defendant's brother was troubled by the baggies which he found. After discussing the situation with his wife Barbara and thinking about it overnight, William turned over the box of trash over to the police the next day.[142]

### Barbara King

On September 3, 2009, Barbara King, William King's wife, testified as follows.  On July 29, 2008 Charles King came to her home with a late birthday present for her husband.[143]  She knew Charles brought the crabs on July 29, 2008 because she

---

[139]    N.T. 9/3/09 at page 51.

[140]    N.T. 9/3/09 at page 44.

[141]    N.T. 9/3/09 at pages 54-57.

[142]    N.T. 9/3/09 at pages 55-56.

[143]    N.T. 9/3/09 at page 108.

personally recorded the date of the visit in a small calendar which she keeps in her pocketbook.[144]

Furthermore, when defendant arrived at her house that day, she noticed that his head and mustache were both shaved.[145] She had never seen defendant look like that and she remarked to him "oh, you have a lip."[146]

### Deirdre Ann Baker

Deirdre Ann Baker, a friend of Charles Everitt King, testified at trial on September 3, 2009 as follows. Defendant asked her to provide him an alibi for his whereabouts on July 26, 2008.[147] She has known Charles King for approximately five years and she is one of his best friends.[148] She lives at 42 East Main Street, Leola, Pennsylvania, and was living there on the date of the July 26, 2008 bank robbery.[149]

During the summer of 2008, Charles and Bobbi King were at her house every weekend and almost every weekend they would spend the night at her home.[150] On July 26, 2008, she and the Kings, together with two other individuals, Ralph Bierman and

---

[144] Id.

[145] N.T. 9/3/09 at page 109.

[146] Id.

[147] N.T. 9/3/09 at pages 67-95.

[148] N.T. 9/3/09 at page 68.

[149] Id.

[150] Id.

Sean Concley, held a yard sale and picnic at her home.[151]
Ms. Baker stated that the Kings arrived at her home at
approximately 7:30 or 8:00 a.m. that morning, and that the Kings
spent the night at her home.[152]

Ms. Baker outlined in detail the activities of herself,
the Kings and Ralph Bierman during the weekend at her home,
including items that were sold and were not sold at the yard
sale.[153]  One of the items she remembered being sold was a boat
which she said defendant sold for $17,000.00.[154]

Charles King left her home numerous times that morning
(July 26, 2008) to pick up additional items for the yard sale.[155]
She accompanied Mr. King on some of the trips that morning, but
was not sure how many times that morning he left on his own.[156]

On cross examination, Ms. Baker admitted that when she
first spoke with defense counsel a few months prior to trial, she
did not specifically remember the events of July 26, 2008.[157]  She
said that her memory would have been better at the time of the

---

[151]   N.T. 9/3/09 at pages 69, 77-78.

[152]   N.T. 9/3/09 at page 69.

[153]   N.T. 9/3/09 at pages 69-71, 76-82.

[154]   N.T. 9/3/09 at page 70.

[155]   N.T. 9/3/09 at page 71.

[156]   N.T. 9/3/09 at pages 70-71.

[157]   N.T. 9/3/09 at page 109.

incident and would have faded with time as most people's memories do.[158]

When confronted on cross-examination with questions about an incident in which Ms. Baker got into a heated dispute with her tenant at Ms. Baker's property during the evening hours of July 26, 2008 into the morning of July 27, 2008, Ms. Baker conceded that her memory of that weekend was not as good as she thought.[159]  Finally, Ms. Baker reiterated that the Kings were at her home every weekend from May through August 2008; that the whole summer was a blur of yard sales and barbeques; and if the Kings had not come over, she would not have had any yard work done all summer.[160]

<u>Special Agent Sean W. Dowd</u>

Special Agent Sean W. Dowd of the Federal Bureau of Investigation testified on September 3, 2009 as follows.  As part of the investigation of the robbery of the M&T Bank Smoketown branch he interviewed Deirdre Baker twice on August 28, 2008.[161]  During those interviews, Special Agent Dowd asked Ms. Baker

---

[158]    N.T. 9/3/09 at page 76.

[159]    N.T. 9/3/09 at pages 84-87.

[160]    N.T. 9/3/09 at pages 89, 92.

[161]    N.T. 9/3/09 at pages 135-136.

whether she had a good recollection of the weekend of July 26, 2008, and she told him that she did not.[162]

Contrary to Ms. Baker's trial testimony, she told Special Agent Dowd during the interviews that Charles and Bobbi King generally arrived at her house about 10:00 a.m., and that they were usually at her home within an hour of 10:00 a.m. during the summer of 2008.[163]

Regarding the weekend of July 26, 2008, Ms. Baker told him she recalled coming home after school, the Consolidated School of Business, on Friday, July 25, 2008. She said she was very excited about receiving a certificate of perfect attendance.[164] Furthermore, while she was "not willing to swear to it" she believed that Charles and Bobbi King were already at her house that day, they celebrated her accomplishment, and the Kings spent the night.[165]

Ms. Baker told Special Agent Dowd that the last weekend in July was one of the best parties and more festive than the Fourth of July celebration.[166] Furthermore, Ms. Baker told him that all the weekends blurred together. She reiterated that she

---

[162]    N.T. 9/3/09 at page 136.

[163]    N.T. 9/3/09 at page 137.

[164]    N.T. 9/3/09 at page 138.

[165]    Id.

[166]    Id.

could not swear to any of what she told him as being exactly what occurred.[167]

Ms. Baker never told him that the Kings spent the night at her home on July 26, 2008, nor did she provide him with any information regarding the Kings' activities on Sunday, July 27, 2008.[168]  Ms. Baker could not provide any specific details concerning what occurred at the yard sale at her house on July 26, 2008.[169]

Special Agent Dowd also testified about the contents of defendant's application for social security disability benefits.[170]  His application was titled Application Summary for Supplemental Social Security Income.  It was dated April 24, 2008 and contained the details of defendant's disability claim.[171]  As part of his disability claim, defendant King reported that he had become disabled on January 1, 2005.  Defendant indicated in the application that the only assets he owned were his 1995 Chevrolet pick-up truck (valued at $1,200.00) and savings of $1,500.00.[172]  In his application, Charles King also reported that the only

----

[167]   Id.

[168]   N.T. 9/3/09 at page 139.

[169]   N.T. 9/3/09 at page 140.

[170]   Government Exhibit 47.

[171]   N.T. 9/3/09 at pages 143-147.

[172]   N.T. 9/3/09 at pages 145-146.

income he expected to receive after April 1, 2008 was state and local assistance in the amount of $215.00 per month.[173]

<u>Detective Preston Gentzler</u>

On September 1 and 2, 2009 East Lampeter Township Police Department Detective Preston Gentzler testified as follows. He was the lead investigator of the July 26, 2008 robbery at the Smoketown branch of M&T Bank.[174]

As part of his investigation, Detective Gentzler obtained surveillance photographs of the robbery from M&T Bank Regional Security Manager Jill Caruso.[175] In addition, pursuant to a search warrant, he obtained from Ms. Caruso bank records for defendant King's bank accounts.[176]

As part of the investigation he received copies of surveillance videotapes from the Centerville Road Turkey Hill store and the Wal-Mart store in Elverson.[177] During the investigation, he became aware that bait money and dye-stained money starting appearing at various locations in the area surrounding the Smoketown branch of M&T Bank.[178]

---

[173]    N.T. 9/3/09 at pages 146-147.

[174]    N.T. 9/1/09 at page 153.

[175]    N.T. 9/1/09 at page 155; Government Exhibits 1-5.

[176]    N.T. 9/1/09 at page 131.

[177]    N.T. 9/1/09 at pages 155-156.

[178]    N.T. 9/1/09 at page 157.

Specifically, Detective Gentzler received from Chief Paul Stolz of the Caerarvon Township Police Department both bait money and other dye-stained money recovered from the Elverson Wal-Mart.[179] In addition, Detective Gentzler received from Head Teller Terry Hohn bait money and dye-stained money which was deposited in a Turkey Hill deposit at the Mountville branch of Fulton Bank.[180] Detective Gentzler also obtained from Western Union Corporation copies of the money orders purchased at the Turkey Hill store.[181]

Two five dollar bills of bait money were also recovered from a Sunoco store in East Earl, Pennsylvania.[182]

During the execution of a search warrant by the East Lampeter Police Department at defendant King's residence a receipt was found from the Warwick Woods Family Camping Resort, located in Saint Peters, Pennsylvania.[183] The receipt is in the name of Charles King and reveals that the check-in date was July 22, 2008 and the check-out date was August 8, 2008.[184]

---

[179]    N.T. 9/2/09 at pages 117-119.

[180]    N.T. 9/2/09 at pages 119-120, 125.

[181]    N.T. 9/1/09 at page 158.

[182]    N.T. 9/2/09 at page 125.

[183]    Government Exhibit 41.

[184]    N.T. 9/2/09 at pages 127-128.

The video obtained from the Elverson Wal-Mart revealed both the inside and outside of the store.[185]  Detective Gentzler testified as to what occurred in the video.[186]  The video revealed that a light-colored truck, with a ladder rack and a tarp covering the ladder rack entered the parking lot of the Wal-Mart store.[187]  The video further revealed that a male exited the truck and entered the store and went to the customer service area.[188]  The white male who exited the truck was wearing a hat with a yellow design.[189]

The yellow hat seen in the Wal-Mart video resembled a hat worn by the male who purchased money orders with dye-stained money at the Turkey Hill on Centerville Road.[190]  Furthermore, a hat similar to the hat seen in both the Wal-Mart and Turkey Hill videos was found in the dashboard of Charles King's white truck.[191]  In addition, Charles King's truck is similar to the one seen in the Wal-Mart video.

Detective Gentzler identified a barber certificate in the name of Charles E. King, dated July 17, 1996, from the

---

[185]    N.T. 9/2/09 at page 128.

[186]    N.T. 9/2/09 at pages 130-135.

[187]    N.T. 9/2/09 at page 130.

[188]    N.T. 9/2/09 at page 134.

[189]    N.T. 9/2/09 at page 135.

[190]    Id.

[191]    N.T. 9/2/09 at pages 135-139.

Commonwealth of Pennsylvania, Department of State, Bureau of Professional and Occupational Affairs which was found during the search of defendant King's home.[192]

Detective Gentzler further identified an Application Summary for Disability Insurance benefits for defendant Charles King, which was recovered during a search of his residence.[193] The document reflected that defendant King claimed to have become unable to work because of his disabling condition on January 1, 2005.[194]

Detective Gentzler received a pizza box with plastic baggies inside from defendant's brother William King. The baggies had a pink stain on them.[195] Furthermore, the baggies had numerical notations written on them in black marker, which were consistent with dollar amounts.[196] The total of the numerical notations on the plastic bags was $1018.00.[197]

On cross-examination, Detective Gentzler testified that although he attempted to obtain fingerprints, he was unable to obtain any from the bank after the robbery.[198] The baggies in the

---

[192]   N.T. 9/2/09 at pages 145-146; Government Exhibit 44.

[193]   N.T. 9/2/09 at pages 146-147; Government Exhibit 45.

[194]   N.T. 9/2/09 at pages 147-148; Government Exhibit 45.

[195]   N.T. 9/1/09 at page 158.

[196]   N.T. 9/1/09 at page 115.

[197]   N.T. 9/1/09 at page 116.

[198]   N.T. 9/2/09 at pages 154-155.

pizza box obtained from William King were never submitted for any testing.[199]

## Charles Everitt King

Defendant Charles Everitt King testified at trial on his own behalf on September 3, 2009 as follows. On August 22, 2008, he gave a statement to Detective Eelman of the East Lampeter Township Police Department. That day defendant was arrested for a parole violation from a 1994 robbery conviction.[200] Defendant King took issue with much of the information contained in the August 22, 2008 interview report prepared by Detective Eelman.[201]

Specifically, defendant King claimed that he never told Detective Eelman that he had traveled to or done work in Virginia, nor had he ever told the police that his aunt died and left him money as part of an inheritance.[202] Mr. King admitted that he possibly told his friend Steve Jones the information about his aunt and an inheritance, but admitted that this information was in fact, not true.[203] Mr. King further admitted

---

[199]    N.T. 9/2/09 at page 153.

[200]    N.T. 9/3/09 at page 154.

[201]    Id.

[202]    N.T. 9/3/09 at pages 154-155, 214-215.

[203]    N.T. 9/3/09 at page 156.

that he lied to Steve Jones when he told him that he had borrowed $3,000.00 from his brother.[204]

In April 2008 defendant filed for Social Security Disability payments but did not follow through with the claim.[205] In filling out disability forms for his social security application on June 17, 2008 he checked boxes stating that he was neither a convicted felon nor presently on parole, even though the correct and truthful answer to both questions would have been "yes".[206] He answered the two questions regarding his prior convictions and his parole status that way because he understood the questions to be asking whether he had been convicted of a new crime or had recently been released on parole.[207]

On the Social Security form he reported that he only received $215.00 per month from welfare and that he did not inform the Social Security Administration that he was working, was doing side jobs or that he had work lined up to do.[208] The Social Security form had a question which asked whether he had any other type of income to which he responded, "no".[209]

---

[204]   N.T. 9/3/09 at pages 213-214.

[205]   N.T. 9/3/09 at page 156.

[206]   N.T. 9/3/09 at pages 181-186.

[207]   N.T. 9/3/09 at pages 185-186.

[208]   N.T. 9/3/09 at pages 189-190.

[209]   N.T. 9/3/09 at page 190.

When answering questions on the Social Security form regarding his resources the only assets he listed were his truck, which was worth $1,500.00, and $1,200.00 in his bank account.[210] He stated in the Social Security form that he was presently living in a trailer[211] and was presently unable to pay to pay his bills because he and his wife did not have enough income.[212] He wrote on the social security form that he had lost his contracting business because he could no longer climb ladders or hold paint brushes.[213]

Defendant and his wife moved out of their College Avenue residence at the end of May 2008 and they camped at different spots for approximately two months.[214] At about the same time he stopped using his bank account because he was "getting out of money" and had received a notice of an overdraft on his account.[215]

Defendant knew that the letter from Ralph Bierman given to Monika Wiker in support of his application to rent the Wissler Road property contained false information about Mr. King and his wife having previously rented from Mr. Bierman, and he knew that

---

[210]    N.T. 9/3/09 at pages 187-189.

[211]    N.T. 9/3/09 at page 195.

[212]    N.T. 9/3/09 at page 197.

[213]    N.T. 9/3/09 at page 201.

[214]    N.T. 9/3/09 at pages 157-159.

[215]    N.T. 9/3/09 at page 159.

before the letter was given to Ms. Wiker.[216]  It was Mr. King's
wife's idea to have Mr. Bierman write the letter.[217]  However, if
necessary, defendant would have lied to obtain the rental of the
Wissler Road property.[218]

Defendant prepared a list to explain how he acquired
the more than $9,000.00 in his bank account in early August
2008.[219]  He sold a boat for $2,800.00, a Mercury Sable vehicle
for $300.00, aluminum siding for $600.00 and a GEO Storm
automobile for an undisclosed amount.[220]

In addition, he received a steady stream of payments
for prior work that he had previously completed for customers.[221]
Defendant received approximately $4,300.00 from both new and old
jobs in the three-month period of May, June and July 2008.[222]

On cross examination, defendant was given the
opportunity to identify the customers for whom he claimed to have
done painting or other work in the months leading up to the
robbery.  However, defendant was unable to identify anyone who

---

[216]   N.T. 9/3/09 at pages 173-175.

[217]   N.T. 9/3/09 at page 173.

[218]   N.T. 9/3/09 at page 174.

[219]   N.T. 9/3/09 at pages 162-163.

[220]   N.T. 9/3/09 at pages 163-164.

[221]   N.T. 9/3/09 at page 165.

[222]   Id.

had made a payment to him during the summer of 2008.[223]  He needed records which were inside his briefcase at the time of his arrest in order to make such identifications.[224]  When defendant was provided his briefcase at trial, he stated that all of the receipts and other documents which would have supported his claims had been removed from his briefcase.[225]

Defendant found $2,600 in "red tainted bills" in a cornfield on approximately July 27, 2008.[226]  When he and his wife were camping, he went out to the nearby cornfield to get some corn to cook on the fire.[227]  While in the cornfield he saw something all red in the field and thought that it was something dead.[228]  Upon further inspection, defendant found that what he saw was a "bunch of one dollar bills".[229]  Defendant picked up the bills and took them to his car then went back to the field and found more money.  He picked that up and took the additional

---

[223]    N.T. 9/3/09 at pages 215-216.

[224]    N.T. 9/3/09 at pages 216-217.

[225]    N.T. 9/3/09 at pages 230-232.

[226]    N.T. 9/3/09 at page 167.

[227]    Id.

[228]    Id.

[229]    Id.

money to his car.[230]  Defendant counted all the money he found and it totaled $2,600.00.[231]

Defendant had lied to people, including his wife, when he told them that he found only $600.00 in the cornfield.  His reason for understating the amount he found was so that he would have $2,000.00 in "play money" which he could use to gamble at the racetrack.[232]  He later bought money orders with the money and then deposited the money orders into his bank account.[233]

When he was first interviewed by the police defendant did not tell them that he had found any red money.[234]  When he was first interviewed by the FBI, he told Special Agent Dowd that he had found $600.00 of red money in a cornfield.[235]  Furthermore, he sent a letter to President Judge Farina of the Lancaster County Court of Common Pleas stating that he had found only $600.00 worth of red money.[236]

Rather than depositing all the money he received into his existing bank account, defendant decided to keep it all in

---

[230]  Id.

[231]  Id.

[232]  N.T. 9/3/09 at pages 167-168.

[233]  N.T. 9/3/09 at page 168.

[234]  N.T. 9/3/09 at page 207.

[235]  Id.

[236]  N.T. 9/3/09 at page 209.

his briefcase in the form of money orders that he purchased.[237] Defendant had traveled around purchasing a total of twenty-nine money orders at a number of locations, rather than buying them all at just one store.  His reason for doing so was "common courtesy" so that other customers would not have to wait in line while he purchased 29 money orders, and because he "[did not] want to give them all my money at one shot."[238]  He lied when he told the clerk at the Wal-Mart store that the money had gotten stained while his wife was canning beets.[239]

Defendant received his barber license in 1996, had worked as a barber in Reading and New Holland, Pennsylvania, and "always cut hair off and on".[240]  When he showed up at his brother's house on July 29, 2008, defendant's head was shaved and all of the hair on his face had been cut down with a clipper.[241]

Furthermore, defendant agreed that his brother and sister-in-law were telling the truth when they testified that they had never seen him with his hair and facial hair as short before July 29, 2008.[242]

---

[237]   N.T. 9/3/09 at pages 165-166.

[238]   N.T. 9/3/09 at pages 222-229.

[239]   N.T. 9/3/09 at pages 175-177.

[240]   N.T. 9/3/09 at pages 199-200.

[241]   N.T. 9/3/09 at pages 219-221.

[242]   N.T. 9/3/09 at pages 220-221.

<u>Stipulated Evidence</u>[243]

On September 3, 2009 five Trial Stipulations were read into the record for the jury's consideration at trial.[244]  The parties stipulated to the following:

>   (1) If called as a witness in this case, a representative of Manufacturer's and Traders Trust Company, Buffalo, New York, would testify that on July 26, 2008, the Manufacturer's and Traders Trust Company-Smoketown, Pennsylvania branch was insured by the Federal Deposit Insurance Corporation.
>
>   (2) If called as a witness in this case, a representative of the Federal Deposit Insurance Corporation would testify that on July 26, 2008, the Manufacturer's and Traders Trust Company-Smoketown, Pennsylvania branch was insured by the Federal Deposit Insurance Corporation.
>
>   (3) If called as a witness in this case, Andrew Peters would testify that on July 26, 2008, up to and including the present date, he has been employed by the Wal-Mart Corporation, in their Asset Protection Department.  Mr. Peters would further testify that on July 29, 2008, he downloaded video of a transaction involving the purchase of two money orders at the Wal-Mart store located at 100 Crossing Boulevard, Caernarvon Township, Pennsylvania.  Mr. Peters would identify the video in court, and further testify that the video depicts a white male and female arriving at the store at approximately 2:12 p.m. in a white Chevrolet pick-up truck, and the white male engaging in a money order transaction.

---

[243]    Government Exhibit 30 contains five stipulations of evidence agreed to by the parties.  Because some of the stipulated evidence contains an element of one the charged crimes (the element in Count One that the Smoketown branch of M&T Bank was insured by the Federal Deposit Insurance Corporation), I have included the parties' stipulations in my discussion of the evidence presented at trial.

[244]    N.T. 9/3/09 at pages 127-131.

(4) If called to testify as a witness in this case, a records custodian from Lancaster County Prison would identify the photograph depicted in Government Exhibit #42 as the arrest photograph taken of Charles Everitt King on August 22, 2008.

(5) If called as a witness in this case, Steven Dixon would testify that he works for the Security Department of Western Union. Mr. Dixon would further testify that pursuant to court order issued by the Honorable David Ashworth of the Court of Common Pleas of Lancaster County, he produced to Detective Preston Gentzler of the East Lampeter Police Department Government Exhibit #21, which he would further identify as Western Union money orders as follows:

> Money Order #08-805991020 payable in the amount of $500.00.

> Money Order #08-805991019 payable in the amount of $500.00.

Taking into account all of the evidence outlined above, together with a review of all the testimony and exhibits presented at trial, I specifically address defendant's two post-trial motions.

### DISCUSSION

### Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 provides that the district court, upon the motion of a defendant or upon its own motion, shall enter a judgment of acquittal if "the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). In ruling on a Rule 29 motion, the district court must determine whether any rational trier of fact could have found proof of the defendant's guilt beyond a reasonable doubt based upon the available evidence presented at trial. United States v. Smith,

294 F.3d 473, 478 (3d Cir. 2002), citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).

The Third Circuit has cautioned, however, that the district court "be ever vigilant in the context of...[a Rule 29 motion] not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Flores, 454 F.3d 149, 154 (3d Cir. 2006).

The court must view the evidence as a whole, and in the light most favorable to the government. United States v. Hoffecker, 530 F.3d 137, 146 (3d Cir. 2008). The government is further entitled to "the benefit of inferences that may be drawn from the evidence[,] and the evidence may be considered probative even if it is circumstantial." United States v. Patrick, 985 F.Supp. 543, 548 (E.D.Pa. 1997), citing United States v. Pecora, 798 F.2d 614, 618 (3d Cir. 1986); see also United States v. Griffith, 17 F.3d 865, 872 (3d Cir. 1994).

The proponent of a Rule 29 motion, therefore, bears a heavy burden to prove that the evidence presented by the government during trial was insufficient to support the verdict. See United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990). In fact, the Third Circuit has held that acquittal should "be confined to cases where the prosecution failure is clear.

Smith, 294 F.3d at 477; United States v. Leon, 739 F.2d 885, 891
(3d Cir. 1984), quoting Burks v. United States, 437 U.S. 1, 17,
98 S.Ct. 2141, 2150; 57 L.Ed.2d 1, 13 (1978).

"The evidence need not unequivocally point to the
defendant's guilt as long as it permits the jury to find the
defendant guilty beyond a reasonable doubt." United States v.
Pungitore, 910 F.2d 1084, 1129 (3d Cir. 1990). Accordingly, "[a]
verdict will be overruled only if no reasonable juror could
accept the evidence as sufficient to support the conclusion of
the defendant's guilt beyond a reasonable doubt."
United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir. 1991);
United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987).

As noted above, defendant avers that, hearing the
government's evidence presented in this case, no rational trier
of fact could have found him guilty of the crimes charged in the
Indictment beyond a reasonable doubt. The government asserts, on
the contrary, that taken in the light most favorable to it
as the verdict winner, the sheer weight of evidence presented to
the jury in this case is overwhelmingly against defendant King.
For the following reasons, I agree with the government.

Reviewing defendant's motion for judgment of acquittal
in the light most favorable to the prosecution and drawing all
reasonable inferences in favor of the jury's verdict, as I am
required to do under the standard of forth above, I conclude that

the testimony elicited by the government at trial, which the jury

apparently believed, together with the exhibits presented, was

sufficient to establish each of the elements of the offenses of

which defendant King was convicted at trial.

### Count One

Count One charges defendant King with armed bank

robbery in violation of 18 U.S.C. § 2113(d).[245]  Section 2113

provides in pertinent part:

> § 2113.  Bank Robbery and incidental crimes
>
>> (a) Whoever, by force and violence, or by
>> intimidation, takes, or attempts to take,
>> from the person or presence another...any
>> ...money...belonging to, or in the care,
>> custody control, management, or possession
>> of, any bank....
>
>> . . .
>
>> (d) Whoever, in committing...any offense
>> defined in subsections (a)...of this section,
>> assaults any person, or puts in jeopardy the
>> life of any person by the use of a dangerous
>> weapon or device, shall be fined under this
>> title or imprisoned not more than twenty-five
>> years, or both.

18 U.S.C. §§ 2113(a) and (d).

Thus, the essential elements of armed bank robbery for

the purposes of this case are that:

>> (1)  defendant took money which was in the care,
>> custody or possession of M&T Bank, from bank

---

[245]    Section 2113(d) of Title 18 of the United States Code incorporates
the elements of bank robbery contained in Section 2113(a) and adds an
additional element of assaulting or putting the life of any person in jeopardy
by the use of a dangerous weapon or device.

employees or from M&T Bank while bank employees or
others were present;

(2)  defendant used force and violence, or
intimidation;

(3)  defendant intentionally put the life of bank
employees or others in jeopardy by the use of a
dangerous weapon or device while taking the money;
and

(4) the deposits of M&T Bank were then insured by
the Federal Deposit Insurance Corporation.

See Third Circuit Model Jury Instruction 6.18.2113D; See also

United States v. Wolfe, 245 F.3d 257 (3d Cir. 2001); United

States v. Beckett, 208 F.3d 140 (3d Cir 2000).

Applying the exhibits and testimony presented at trial,

in the light most favorable to the government, to the elements of

Count One, it is clear that the perpetrator of the bank robbery

engaged in conduct which satisfies all the elements of the crime

of armed bank robbery.  In this regard, the testimony of bank

teller Julie K. Burkholder and teller supervisor Roni Hackman-

Ryner, together with the trial stipulations of the parties

contained in Government Exhibit 30, satisfy the four elements of

armed bank robbery by the perpetrator of the crime.

Initially, both Ms. Burkholder and Ms. Hackman-Ryner

testified that they were at the bank on the morning of the

robbery with each other and their co-worker Sarah Wenger.

Furthermore, they both testified that they placed money from

their respective teller drawers into a bag that the robber took

out of the bank when he left.  Thus, the first element requiring
that the robber take money that was in the bank's care custody or
possession from bank employees is satisfied.

Next, both Ms. Burkholder and Ms. Hackman-Ryner
testified that the robber had a weapon, a black handgun, and
threatened to shoot everyone if they did not do what they were
told.  In addition, Ms. Burkholder testified that when the robber
entered the bank, he pointed the gun at her, and then toward the
ceiling.  This testimony satisfies both element two (requiring
that the robber used force and violence or intimidation), and
element three (requiring that the robber intentionally placed the
life of bank employees in jeopardy while taking the money).

In that regard, the robber used force or intimidation
by pointing the gun at Ms. Burkholder, and thereby placed her
life in jeopardy.  In addition, the threat by the robber to shoot
everyone was both intimidating and an intentional act by the
robber which put the lives of the bank employees in jeopardy if
they did not follow his instructions.  Thus, taken in the light
most favorable to the government, this testimony satisfies both
elements two and three.

Finally, Government Exhibit 30, the stipulation of the
parties on certain evidence, includes as part (1) the stipulation
that the Smoketown branch of M&T Bank was insured by the Federal

Deposit Insurance Corporation.[246]  Thus, the final element of
armed bank robbery is satisfied.  However, this does not end
the inquiry because defendant must be linked as the perpetrator
of the bank robbery.

Taken in the light most favorable to the government,
there is sufficient evidence to link defendant to the robbery.
Initially, defendant admits he used dye-stained money to purchase
some of the money orders.  Moreover, Chief Stolz testified that
some of the money that defendant used to buy money orders from
the Elverson Wal-Mart was bait money from the bank.  This is
direct evidence that defendant was in possession of the proceeds
of the robbery.

Defendant King was trained and licensed as a barber.
Thus, a reasonable inference is that defendant was familiar with
methods of changing his appearance including dyeing his hair.
Both Julie Burkholder and Roni Hackman-Ryner testified that the
bank robber had dyed hair and Ms. Burkholder even commented that
it was a really bad dye job.  A reasonable inference could be
that defendant left Dee Baker's house under the guise of getting
more items for the yard sale, quickly dyed his hair to cover up

---

[246]     The stipulation provided that if called as a witness, a
representative of the bank would testify that the Smoketown branch of M&T Bank
was insured by the Federal Deposit Insurance Corporation.  At sidebar, counsel
clarified that the stipulated testimony must be accepted by the jury as
binding and conclusive for purposes of this trial, will require no further
proofs, and will permit no contradictory evidence.  (N.T. 9/3/09 at pages
124-127).

his normal look, committed the bank robbery and then shaved off his hair and beard to further alter his appearance.

Furthermore, pictures of defendant and the bank robber were presented as evidence at trial. The jury could have reasonably examined the pictures and compared the photographs of the robber and of defendant. The jury further had the opportunity to view defendant at counsel table and on the stand during his testimony. It is reasonable to conclude that the jury, in viewing the pictures of the robber together with the pictures of defendant and their own observations of defendant, determined that defendant King and the bank robber were the same person.

In addition, defendant's brother and sister-in-law testified that defendant had shaved his hair and beard soon after the robbery, which they had never known him to do before. This evidence, together with its reasonable inferences, taken in the light most favorable to the government, establish that defendant was attempting to change his appearance, both for the robbery itself, and after the fact, to cover up his involvement in the robbery.

Defendant made conflicting statements to his wife, friends and law enforcement officers about how he obtained the significant amount of money he had in the days and weeks after the robbery. Taken in the light most favorable to the

government, this evidences an attempt to cover up defendant's involvement with the robbery by providing explanations for where he obtained the money in his possession.

The testimony also established that prior to the robbery, defendant had a negative balance in his bank account, and had borrowed money from his brother to pay for his fees at the campground. Moreover, defendant filed for social security disability payments, claiming that he was unable to work, and alleging that he and his wife were living on $215.00 per month and had no means of paying their bills.

However, within less than two weeks after the robbery, defendant deposited substantial sums of money in his bank account[247], and he purchased gifts for relatives and paid for a new place to live. Taken in the light most favorable to the government, this is evidence from which the jury could have reasonably inferred that defendant had robbed the bank and was laundering and spending the proceeds of his crime.

Defendant admitted that he purchased 29 money orders at numerous locations between July 29 and August 11, 2008 totaling over $14,000. Defendant further admitted that he made up a story about his wife spilling beet juice on money that was dye-stained in an effort to deflect questioning by a store clerk about the pink color of the money. Defendant testified that he went to all

---

[247]    N.T. 9/3/09 at page 222.

of these locations where he purchased the money orders as a
courtesy to prevent other customers from waiting in line, and
because he did not want to give one store all his money at one
time.  The jury reasonably could have determined that defendant's
explanation was not true and further determined that his actions
were evidence of his guilt.

After viewing all of the evidence presented at trial,
taken in the light most favorable to the government,
defendant's post-robbery actions constitute circumstantial
evidence of defendant covering up his crime and attempting to
launder the robbery proceeds.

Accordingly, taking into account the testimony of all
the witnesses, the exhibits presented at trial and the plausible
possible credibility determinations of the jury, I conclude that
there was sufficient evidence by which the jury could determine
that defendant Charles Everitt King was the man who committed the
July 26, 2008 robbery of the Smoketown branch of M&T Bank.
Furthermore, after review of the evidence, I conclude that a
reasonable juror could accept the evidence against defendant King
as sufficient to support the conclusion of defendant's guilt
beyond a reasonable doubt.  <u>Salmon</u>, 944 F.2d at 1113.

### Count Two

Count Two of the Indictment charges defendant with
knowingly using and carrying a firearm during and in relation to

a crime of violence, that is, bank robbery, in violation of 18

U.S.C. § 924(c)(1).

Section 924(c)(1)(A) provides in pertinent part:

> [A]ny person who, *during and in relation to any crime of violence*...for which the person may be prosecuted in a court of the United States, *uses or carries a firearm*, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime...[be sentenced to a certain number of years depending on the facts of the crime.]

18 U.S.C. § 924(c)(1)(A)(emphasis added); <u>See</u> <u>also</u>

<u>United States v. Williams</u>, 344 F.3d 365, 370 (3d Cir. 2003).

Thus, in this case, based upon the charges contained in the Indictment, the elements which the government must prove to establish a violation of 18 U.S.C. § 924(c)(1) are as follows:

(1)  that defendant committed the crime of armed bank robbery;

(2) that defendant knowingly[248] used or carried a firearm; and

(3) that the use or carrying of the firearm was during and in relation to the commission of the crime of armed bank robbery.

There are three separate, alternative ways that someone may violate § 924(c)(1)(A).  Specifically, there is a "use",

---

[248]    Although 18 U.S.C. § 924(c)(1)(A), quoted above, does not include the requirement that defendant used or carried the firearm "knowingly", Third Circuit Model Jury Instruction 6.18.924A does.  Accordingly, in charging the jury on the elements of Count Two, I instructed them, in part, that they must find beyond a reasonable doubt that "during and in relation to the commission of that crime, the defendant knowingly used and carried a firearm."  Notes of Testimony of the jury trial conducted September 8, 2009 before me in Allentown, Pennsylvania, styled "Transcript of Trial before the Honorable James Knoll Gardner[,] United States District Judge" at page 59.

"carry" or "possession" prong of this offense.

See United States v. Loney, 219 F.3d 281, 287 (3d Cir. 2000).

The "use" or "carry" of a firearm must be "during and in relation to" any crime of violence; whereas, the "possession" of a firearm must be "in furtherance of" a crime of violence.  Id.

In this case, the government contends that defendant both used and carried the firearm.  They do not contend that he "possessed" the firearm in furtherance of a crime of violence. Accordingly, I do not discuss below, defendant's possession of the firearm.

Here, the government proved the first element by establishing defendant's guilt on Count One for armed bank robbery.  Moreover, the testimony of Ms. Burkholder and Ms. Hackman-Ryner that defendant had a gun, brandished it, and threatened to use it if they did not do as he requested clearly satisfies the "use", "carry" and "during and in relation to" elements of the charge.  Accordingly, I conclude that there is sufficient evidence in the record to support a conclusion that all of the elements of § 924(c)(1)(A) have been satisfied.

### Defense Contentions

In his motion for acquittal, defendant contends that there is no direct evidence that he was the perpetrator of the robbery, and asserts that he has an alibi.  More specifically, as noted above defendant avers the following:

(1)   there was no proof that defendant owned a gun or that a gun was found in defendant's possession;

(2)   none of the clothing used by the bank robber was found in defendant's possession;

(3)   the testimony of Dee Baker established an uncontroverted alibi;

(4)   no eyewitness identified defendant as the bank robber or even being in the bank;

(5)   the majority of the money taken from the bank was never found in defendant's possession;

(6)   there was insufficient evidence to prove that a dye pack was present in defendant's car;

(7) defendant's work history, sales and accounts receivable refuted the government's alleged motive for the bank robbery being that defendant was destitute; and

(8) there was no forensic evidence proving that defendant was in the bank.

Defendant's brief is devoid of any argument regarding his contentions.  Rather, he simply states that his contentions prove that no reasonable jury could have found him guilty. Notwithstanding defendant's lack of argument in support of the contentions contained in his motion, I address defendant's contentions on the merits.

The government concedes that no eyewitnesses identified defendant as being inside the bank and no clothing or gun was ever recovered and linked to defendant.  Moreover, the government concedes that there was no forensic evidence inside the bank which ties defendant to this robbery.  The government disputes

the remainder of defendant's contentions.  Finally, the
government contends that there is substantial circumstantial
evidence linking defendant to the crime.  I agree.

In a criminal case, the government may bear its burden
of proof entirely through circumstantial evidence.
United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006)(citing
United States v. Wexler, 838 F.2d 88, 90 (3d Cir. 1988)).  Thus,
defendant's contentions that there was no direct evidence
(contentions one, two four and eight), although accurate, do not
by themselves require that I grant his motion for judgment of
acquittal.

The pieces of direct evidence that defendant avers are
missing would, if present, strengthen the government's case
against him.  However, the lack of such direct evidence does not,
by itself, or in combination with one another, require a finding
that the jury's verdict is against the weight of the evidence in
light of the circumstantial evidence produced by the government
at trial.

Accordingly, defendant's motion for judgment of
acquittal based upon contentions one, two, four and eight is
denied.

Regarding the alibi testimony of Dee Baker
(contention three), credibility determinations are generally in
the province of the jury.  United States v. Hoskins, 628 F.2d

295, 296-297 (5th Cir. 1980); <u>See</u> <u>also</u> <u>Anderson v. Liberty Lobby,</u> <u>Inc.,</u> 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the jury was free to accept or reject the testimony of Ms. Baker, and obviously rejected her testimony.

The jury's apparent credibility determination could be based upon a finding that the alibi testimony of Dee Baker was not credible because the testimony was inconsistent with Ms. Baker's previous statements given to Special Agent Dowd. The jury could have found Special Agent Dowd's testimony credible and determined that Ms. Baker was adding new detail to her story in an effort to help her friend, Mr. King.

Moreover, Ms. Baker's testimony, even if believed, does not establish a perfect alibi. She testified that defendant King left her home, alone, on a number of occasions the morning of July 26, 2008, to pick up items for the yard sale they were conducting. She did not testify that defendant was at her home at 11:30 a.m., when the bank was robbed. Thus, even if the jury believed her testimony in all respects, the alibi testimony is imperfect because Ms. Baker did not provide testimony fully accounting for Mr. King's whereabouts at the time of the robbery.

Accordingly, I conclude that defendant's character-ization of Ms. Baker's alibi testimony as "uncontroverted" is misplaced because it fails to recognize that the jury was free to disregard her testimony on credibility grounds, or that the

purported alibi did not actually account for defendant's whereabouts at the time of the robbery.

Therefore, I conclude that defendant's third contention does not warrant granting defendant's motion for judgment of acquittal.

Next, in contention five, defendant asserts that the verdict is against the weight of the evidence because most of the money from the robbery was not found in his possession. However, defendant disregards his own admitted conduct in purchasing 29 money orders with cash, some of which was specifically identified by other witnesses as either dye-stained, was bait money from the bank, or both. Moreover, defendant deposited in excess of $14,000.00 into his bank account between August 4, 2008 and August 12, 2008 from those same money orders.[249]

Furthermore, defendant admitted that he was in possession of dye-stained money. The jury was free to disregard defendant's version of how that money became dye-stained. They were also at liberty to disregard how he came into possession of that money and free to determine that the circumstantial evidence presented by the government established that he came into possession of the money by robbing the bank, and did not find the money in a cornfield. The fact that a majority of the money was

---

[249]    Government Exhibit 17; N.T. 9/3/09 at page 222.

not found in defendant's possession does not preclude a finding by the jury that he was the bank robber.

Accordingly, I deny defendant's motion for judgment of acquittal on the basis of defendant's fifth contention.

Next, in contention six, defendant avers that there was insufficient evidence to prove that a dye pack was present in his car. I disagree.

The testimony of government witnesses, which the jury was free to believe, established that red-stained carpet was taken out of defendant's vehicle. Testing revealed results consistent with the chemicals used in the dye packs acquired by M&T Bank. Thus, there is sufficient evidence, which, if believed by the jury, supports a conclusion that a dye pack or dye-stained money was present in defendant's truck.

It was for the jury to assess the weight to be given to that evidence in light of all the other evidence. Moreover, in viewing this evidence in the light most favorable to the government, Hoffecker, 530 F.3d at 46, it was entirely possible for the jury to determine that the carpeting in defendant's car was stained by the dye pack that exploded in the bag utilized by him to carry the proceeds of the robbery.

Accordingly, I disagree with defendant that there was insufficient evidence to prove that a dye pack was in his car when viewed in the light most favorable to the government, and I

deny defendant's motion for judgment of acquittal on the basis of his sixth contention.

Finally, in contention seven, defendant asserts that his work history, sales, and accounts receivable refuted the government's allegation that his motive for the bank robbery was that he was destitute.  I disagree.

Once again defendant disregards the possibility that the jury may have found not credible his testimony regarding his work history and financial condition, based upon evidence produced at trial.  That evidence includes, but is not limited to, defendant's bank statements indicating that he had a negative balance in his account until just after the robbery; his application to the Social Security Administration indicating that he did not have enough money to pay his bills and was unable to work; and the testimony of defendant's brother William that defendant borrowed money to pay his campground bill soon before the July 26, 2008 bank robbery.  Moreover, there was evidence that defendant and his wife had been evicted from their prior residence.

During cross-examination by government counsel, defendant was unable to identify with any specificity the jobs he had recently completed and from whom he had obtained money from for past completed work.  Thus, the jury could have discounted defendant's explanations for where he obtained the thousands of

dollars deposited into his bank account between the end of July and mid-August 2008, and concluded that the money came from the proceeds of the bank robbery.

There are other inferences which might have been drawn from the evidence produced at trial as well. However, the evidence need not be inconsistent with every conclusion except guilt if it establishes a case from which the jury can find the defendant guilty beyond a reasonable doubt. <u>United States v. Sandini</u>, 888 F.2d 300, 311 (3d Cir. 1989).

Accordingly, I deny defendant's motion for judgment of acquittal based upon defendant's contention seven, and therefore deny defendant's motion in its entirety.

<u>Motion for New Trial</u>

Rule 33 of the Federal Rules of Criminal Procedure provides that "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). A verdict against the weight of the evidence is a permissible ground to grant a new trial under Rule 33. <u>United States v. Brennan</u>, 326 F.3d 176, 189 (3d Cir. 2003).

A district court is only empowered to grant a new trial based upon the verdict being contrary to the weight of the evidence when it believes that there is a serious danger that a miscarriage of justice has occurred, that is, that an innocent

person has been convicted.  <u>Brennan</u>, 326 F.3d at 188-189;

<u>United States v. Avery</u>, 2005 U.S.Dist LEXIS 15979 at *12

(E.D.Pa. Aug. 3, 2005)(Padova, J.).

     Unlike a motion for insufficiency of the evidence under

Rule 29, in which the court views the evidence in the light most

favorable to the government, a Rule 33 motion permits the court

to exercise its own judgment in assessing the government's case.

<u>Brennan</u>, 326 F.3d at 189.

     Although the court exercises its own judgment in a

Rule 33 motion, including the right to weigh the evidence and

determine credibility, the court "may not reweigh the evidence

and set aside the verdict simply because it feels some other

result would be more reasonable." <u>United States v. Nissenbaum</u>,

2001 U.S.Dist. LEXIS 6039 at *2-*3 (E.D.Pa. May 8, 2001)

(Waldman, J.).

     The United States Court of Appeals for the Third

Circuit has emphasized that motions for a new trial based upon

weight of the evidence are not favored and should be granted

sparingly, and only in exceptional cases. <u>Government of the</u>

<u>Virgin Islands v. Derricks</u>, 810 F.2d 50, 55  (3d Cir. 1987).

     Having independently assessed the evidence presented by

the government at trial, together with the evidence produced by

defendant through cross-examination of the government's

witnesses, I conclude that this is not one of the exceptional

cases in which the weight of the evidence preponderates so heavily against the jury's verdict that a new trial is necessary to avoid a miscarriage of justice.

Rather, for the reasons expressed in my findings regarding defendant's motion for judgment of acquittal, the jury's verdict was supported by the weight of the evidence. Moreover, the volume and weight of the circumstantial evidence in this case does not leave the court with the impression that an innocent man was convicted. <u>Brennan</u>, 326 F.3d at 188-189.

Accordingly, defendant's motion for a new trial is denied.

<u>CONCLUSION</u>

For all the foregoing reasons, I deny both Defendant Charles Everitt King's Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure and Defendant Charles Everitt King's Motion for New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure.